UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                :

MANUEL ROMAN,                        :
                                                :
                    Petitioner,          :            09 Civ. 7942 (GEL)
         -v-                       :            01 Cr. 1110 (GEL)
                                                :

UNITED STATES OF AMERICA,        :      **OPINION AND ORDER**
                                                :
                    Respondent.      :
------------------------------------------------------------x

GERARD E. LYNCH, Circuit Judge:[*]

      Manuel Roman, a federal prisoner, moves pursuant to 28 U.S.C. § 2255 to vacate his conviction, and resulting sentence primarily to a sentence of life plus 300 months in prison, on all counts of a twelve-count indictment charging him with various offenses involving racketeering, murder, trafficking in heroin and cocaine, and the possession and use of firearms.  The Court of Appeals affirmed his conviction by summary order.  United States v. Garcia, 282 F. App'x 14 (2d Cir. 2008).

      Roman's pro se petition, which opens with several pages of background legal assertions and a number of procedural requests, is in some parts difficult to parse.  On occasion, Roman lumps separate claims together and labels as separate claims what are in essence legal propositions relevant to legal theories spelled out elsewhere in the petition.  The Court addresses below those arguments that can be deciphered from his petition.  As none of those arguments has any merit, the petition is denied.

      The factual background to the case can be summarized briefly.  The evidence at the six-

---

     [*] The Honorable Gerard E. Lynch, United States Court of Appeals for the Second Circuit, sitting by designation.

week long trial overwhelmingly established that Roman and his mother, Rosalie Garcia, were the leaders of a heroin-distribution enterprise in the South Bronx for a ten-year period primarily centered in the 1990s. During that period, the enterprise sold vast quantities of heroin, as well as some cocaine. To further this enterprise and protect their turf, Roman and Garcia fought a number of wars with rival drug organizations. In the course of these wars, Roman solicited and paid for at least three murders, and personally participated in a fourth. In addition to testimony by police officers, crime scene and medical experts, and victims, the government presented five different cooperating individuals who were part of the organization and personally participated in the various crimes charged.

## I. Actual Innocence

In a jumble of arguments (Pet. 3-6, 9-24, 48-52), Roman seeks to "expand the record," demands additional discovery, and argues that he is actually innocent of the crimes charged. While Roman appears to disavow a free-standing claim of actual innocence in favor of a claim that his alleged showing of innocence (or his potential to make such a showing with additional discovery or the submission of new evidence) can serve as a "gateway" to permit him to make other, procedurally defaulted claims, see Schlup v. Delo, 513 U.S. 298 (1995), it is not at all clear what procedurally defaulted arguments he wishes to assert. Be that as it may, Roman's claims of innocence are fantastical.

First, as noted above, the evidence of Roman's guilt was truly overwhelming. While the credibility of the cooperating witnesses was vigorously attacked at trial, their interlocking, independent recollections of events, as corroborated by physical evidence and police witnesses, resulted in a powerful prosecution case and a quick and decisive verdict from the jury. None of

the materials discussed by Roman cast any shadow of doubt on the proof of his guilt of the charges in the indictment.

Second, the materials that Roman presents in his petition are not new evidence in any sense of the word. All of the documents he proffers are materials that were provided to the defense by the government as part of its discovery, Jencks Act, or Brady obligations. To the extent that some of the materials record statements made (often in the form of anonymous tips) to the police during the investigation of some of the murders at issue at the trial that are arguably inconsistent with the government's theory of the case, they are inadmissible hearsay that bear no indicia of reliability. The same is true of two videos Roman references. (Pet. 9-11, 16.) One is a statement by witness Steven Serrano. It was provided to the defense, was available to use for cross-examination, and is largely consistent with Serrano's trial testimony on the subjects covered in the videotaped statement. The other, involving a post-arrest statement by one Hector Rosario relating to some of the murders, was similarly provided to the defense in discovery, was offered by the defense at trial, and was correctly excluded by the Court as inadmissible, unreliable hearsay. (Tr. 3529-34.)

Finally, much of the discovery that Roman seeks involves requests for more information about the various documents that were provided to the defense. While it may be understandable that some of the documents are confusing to a lay defendant, the provenance and significance of these documents would generally have been quite apparent to experienced and competent defense counsel such as appeared for Roman in this case. There is nothing whatsoever in the submission that suggests that defense counsel were unaware of these documents, or unable or unwilling to explore their significance and use them at trial (or not) to whatever advantage they did (or did

3

not) confer on the defense.

In short, for all the length of Roman's submission, there is nothing in the nature of newly-discovered, let alone suppressed, exculpatory evidence, and certainly nothing that demonstrates Roman's "actual innocence," in the materials to which he refers.

## II. Ineffective Assistance of Counsel

Roman's principal substantive claim is that he was provided ineffective assistance of counsel. Before addressing the specific claims of constitutional error encompassed in this argument, it is necessary to put the argument in some context. Because the case carried the potential for capital punishment, Roman was represented by not one but two appointed attorneys, one of whom was qualified as a "learned counsel" specially designated to provide representation in capital cases. Before substantive proceedings on the indictment were even under way, these attorneys succeeded, by vigorous investigation and advocacy, in persuading the Department of Justice not to seek the ultimate penalty, despite the strength of the case and the vicious nature of the multiple murders Roman was charged with ordering and committing. After the death penalty had been taken off the table, Roman moved for permission to have his second attorney continued, due to the complexity of the case and the extensive factual knowledge both counsel had developed during the course of their sentencing advocacy before the Department. The Court granted the motion, and Roman was represented by both attorneys at trial.

Through several years of preliminary proceedings and six weeks of trial, the Court observed these attorneys' performance. It was abundantly clear to the Court that both counsel for Roman performed with skill and diligence, vigorously deploying every argument at their disposal, skillfully cross-examining the government's witnesses, and arguing inventively and

4

ably to the jury in the face of overwhelming evidence of guilt. This admirable performance demonstrated counsel's extraordinary preparation and detailed knowledge of the complex and confusing welter of facts relating to years of drug-dealing activities, numerous plots and counter-plots, and multiple murders and attempted murders committed by and against members of Roman's organization. Counsel's advocacy displayed the fruits of diligent labor over, and utter mastery of, the voluminous discovery and 3500 material. The Court also had occasion to observe counsel's frequent and extensive consultations with Roman, and their apparent rapport with him. While these observations do not obviate the need to examine carefully the specific claims of shortfalls in performance advanced by Roman in this petition, they do generate considerable skepticism about those claims, and make Roman's claims of lack of diligent investigation particularly ironic and unpersuasive.

Also before turning to Roman's specific allegations, it is necessary to set forth the legal standards governing his claim. A defendant attacking his conviction based on alleged ineffective assistance of counsel must demonstrate (1) that counsel's performance fell short of "an objective standard of reasonableness" judged against "prevailing professional norms," and (2) that counsel's unprofessional performance prejudiced defendant, by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687-89, 693-94 (1984).

A. Failure to Investigate

Roman claims, and alleges in a sworn affidavit, that his attorneys failed to interview him prior to trial concerning the facts of the case. Counsel denies this allegation, submitting an affidavit referencing the "extensive conferences" by both counsel "throughout the representation,

5

in private and, on occasion, at joint defense meetings with co-defendants and co-counsel."
(Goltzer Aff. ¶ 6.)  As noted above, the Court personally observed such conferences taking place
during the pre-trial proceedings and at trial, and had frequent occasions to note that counsel spent
significant time with Roman in holding cells in preparation for court appearances.  Moreover,
counsel's skillful performance at trial could not have been achieved without extensive
preparation, both in private study and in consultation with the defendant.  And as the government
notes in its response (Letter of AUSA David M. Rody to the Court, Mar. 9, 2010 ("Rody
Letter"), at 7), counsel produced an extensive death penalty mitigation submission, including
information that could only have come from interviews with Roman.

At any rate, even in the unlikely event that Roman could demonstrate his far-fetched
claim of unprofessional lack of investigation, his claim of ineffective assistance fails for lack of
any showing of prejudice.  Neither in his factual affidavits nor in his extensive briefing does he
explain wherein the alleged failure to interview him caused prejudice to his defense.  While
Roman argues that an interview was necessary "to determine if an investigator was required for
trial" (Pet. 25), Roman does not explain how (or even claim that) an investigator would have
been helpful to the defense.  Indeed, Roman does not explain what additional facts counsel
would have learned from conducting an interview, or how those facts would have assisted in
challenging the government's evidence or conducting a defense.  (Indeed, this omission not only
defeats any claim of prejudice, but also undermines the credibility of the underlying allegation.  If
counsel had proceeded in the kind of ignorance Roman suggests, examples of resulting prejudice
presumably would have been legion.)

B. <u>Infringement of Right to Testify</u>

Roman similarly claims that his experienced attorneys infringed his right to testify by misrepresenting to him that whether to testify was counsel's decision, not his, and by refusing to call or allow him to testify at trial despite his "repeated requests." (Pet. 26.) A defendant's claim that defense counsel did not discharge his responsibility to advise the client properly concerning the exercise of his constitutional right to testify must satisfy the <u>Strickland</u> standard. <u>United States v. Caracappa</u>, 614 F.3d 30, 48 (2d Cir. 2010), <u>aff'g and quoting</u> <u>United States v. Eppolito</u>, 436 F. Supp. 2d 532, 562 (E.D.N.Y. 2006). Roman's claim is belied not only by counsel's emphatic and credible denials but also by the trial record.

Every trial judge and criminal defense lawyer is familiar with the after-the-fact fantasy of criminal defendants that the trial would have come out differently if only they had testified. Whether the defendant in good faith convinces himself that it was his lawyers rather than he who made the decision, or the defendant deliberately fabricates the claim that his lawyers "refused to allow [him] to testify" (Pet. 26), the allegation is easily made. But experienced defense counsel are also thoroughly conversant with their professional obligation to inform their clients that the decision whether to testify is for the client alone, and however vigorously they convey their opinion about the *wisdom* of testifying in particular cases, ethical lawyers understand that they are required to advise the client of his choice and to respect whatever choice the client makes, however ill-advised the decision may be. Roman's principal attorney swears that he understands these obligations, and that, consistent with his "practice in every case," he advised Roman of his right to testify, discussed the tactical merits of testifying or not, did not prevent him from testifying, and ultimately did not call him because Roman "elected not to testify." (Goltzer Aff.

7

¶¶ 3, 4, 7.)  Co-counsel does not recall the specific conversations, but affirms that she "would never tell a client that he could not take the witness stand."  (Barrett Aff. ¶ 7.)

These attestations are fully credible in light of the Court's observations of counsel, experience with these attorneys in other cases, and long experience as a judge and criminal law practitioner.  More importantly, they are corroborated by the trial record.  On each of the last three days of trial, the Court specifically inquired of defense counsel (outside the presence of the jury but with the defendants present) as to whether a defense case was anticipated.  (Tr. 3270, 3429-30, 3522, 3535.)  On the first and third of these occasions, Roman's counsel advised the Court that there were no plans for Roman to present testimony.  (Tr. 3429, 3535.)  Roman raised no question or objection on either occasion, despite the Court's reference to the defendants' "right" to put on a defense and the possibility that one or more of the defendants could "decide[] they want to testify."  (Tr. 3429-30.)  On the second of the three occasions, counsel for co-defendant Garcia requested on behalf of all defense counsel an opportunity to "meet with the clients collectively . . . to all confer" about whether there would be a defense case.  The request was granted, and the Court observed a joint defense meeting in the back of the courtroom.  (Tr. 3522.)  In light of these events, it is difficult to conceive how Roman could have been misled about his right to testify, or that his attorneys could have, in the presence of the other two defendants and their four attorneys, coerced him not to testify if he expressed a desire to do so. (In effect, the conspiracy to mislead Roman about his rights would have involved unethical conduct by not one but six defense counsel.)

Contrary to Roman's contention (Pet. 34-38, 47-48), the dispute between Roman and his attorneys about what advice he was given does not require a hearing.  As the Supreme Court has

8

pointed out, a habeas petitioner need not

> always be allowed to appear in a district court for a full hearing if the record does not conclusively and expressly belie his claim, no matter how vague, conclusory, or palpably incredible his allegations may be. The language of [§ 2255] does not strip the district courts of all discretion to exercise their common sense. Indeed, the statute itself recognizes that there are times when allegations of facts outside the record can be fully investigated without requiring the personal presence of the prisoner.

Machibroda v. United States, 368 U.S. 487, 495 (1962).

The Second Circuit has held, with specific reference to accusations by defendants that they were deprived of their right to testify, that it is "within the district court's discretion" to choose the "middle road" of deciding the case based on written submissions, after soliciting affidavits from defense counsel. Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001). This procedure "avoid[s] the delay, the needless expenditure of judicial resources, the burden on trial counsel and the government, and perhaps the encouragement of other prisoners to make similar baseless claims that would [] result[] from a full testimonial hearing." Id. The Second Circuit has particularly noted that this procedure makes sense where a judge who has presided over a lengthy trial has had the opportunity to observe both counsel and client, and where "the credibility assessment would inevitably be adverse to the petitioner." Puglisi v. United States, 586 F.3d 209, 214 (2d Cir. 2009).

That is emphatically the case here. The Court has had the opportunity, at sentencing, to see Roman assert that he had been deprived of the opportunity to testify. (6/16/06 Tr. 15.) It has had the opportunity to compare Roman's lengthy and detailed account of the completely fanciful testimony he now asserts that he would have offered (Pet. 40-47) with the overwhelming

9

evidence at trial, and the credibility of the witnesses who testified against him.  On this record,

Roman's claims are flatly incredible.  For the same reasons, it is clear that his testimony would

not have resulted in a more favorable outcome at trial, and that therefore even if he had been

given insufficient advice about his right to testify, he could not possibly meet the prejudice prong

of Strickland.  See Caracappa, 614 F.3d at 49 (denying § 2255 relief based on district court's

conclusion that defendant's trial testimony would surely have harmed his defense).

Accordingly, the Court rejects Roman's claims of ineffective assistance of counsel.

## III. Joinder

Roman argues that he was improperly tried "en masse," and that the Court failed to guard

against the dangers of such a trial in its jury instructions.  (Pet. 52-54.)  The precise content of

this claim is unclear.  Roman's trial was hardly comparable to the 32-defendant indictment and

19-defendant trial discussed in Kotteakos v. United States, 328 U.S. 750 (1946).  Roman was

tried with only two co-defendants, one of them his mother.  He was charged in every count of the

indictment, and neither of his co-defendants was alleged to have participated in any violent crime

to which Roman himself was not directly linked.  Any concern that Roman may have been

convicted through some process of "guilt by association" with his co-defendants is obviated by

the fact that neither the quantity nor the quality of the evidence, nor the nature of the conduct

alleged, against the other defendants was in any way more probative or more inflammatory than

the evidence against Roman himself.

Roman does not argue, nor could he, that he was improperly joined with the other

defendants for trial.  Nor does he argue that any evidence that was admitted at the joint trial that

would not have been admissible had he been tried alone, or any evidence that should have been

10

admitted only as to a co-defendant that was improperly allowed to be considered against him.
Roman nevertheless argues that he was tried "with" over 100 individuals (Pet. 53) whose names
were mentioned at the trial as members of the criminal enterprise he was charged with directing,
or of associated or rival enterprises. This is sophistry. Only three defendants were tried on this
indictment. That Roman's criminal activities were extensive, and lasted for years, and brought
him in contact with numerous other drug dealers as subordinates, colleagues, suppliers,
customers, hit men, informants or enemies does not convert his trial into a "mass" trial.

Relatedly, Roman appears to contend that the evidence at the trial may have confused the
jury about what he now suggests were different, overlapping enterprises, gangs or crews. (Pet.
52-53.) But this, at best, is an argument that the evidence proved multiple conspiracies or
enterprises rather than the single conspiracy or enterprise charged in the indictment. At
defendants' request, the jury was properly given a standard "multiple conspiracies" instruction
that made clear that the jury could not convict on a conspiracy count unless it found that the
existence of the single conspiracy charged in the indictment had been proven beyond a
reasonable doubt. (Tr. 3903-04.) He does not contend now, any more than he did at trial or on
appeal, that there was any defect in this charge, nor does he contend that the evidence was not
sufficient – which it manifestly was – to permit the jury to find a single conspiracy or enterprise.
Indeed, he implicitly concedes the sufficiency of the evidence (Pet. 53), arguing that the
witnesses who provided the testimony linking the various aspects of Roman's activities together
were improperly motivated. (Pet. 3, 22, 53.) The credibility of the witnesses was for a properly-
instructed jury to decide, and the jury decided that issue adversely to Roman.

In a somewhat confusing postscript to this argument, Roman appears to argue that he was

11

somehow denied "his right to present evidence [that] others may have committed the offenses for which he was charged." (Pet. 54.) As with his "actual innocence" claims discussed above, Roman appears to state that he "does <u>not</u> claim" that this alleged denial "should stand by itself as a reason to vacate" his conviction, but only that it should operate as a "gateway" to an evidentiary hearing on other issues. (<u>Id.</u> (emphasis in original).) Whatever force Roman attributes to this argument, however, it is without merit, as Roman had every opportunity at trial to present whatever admissible evidence may have existed to support such a defense.

Finally, Roman appears to argue that his "rights were violated by the Government's failure to request [an] 'extraordinary precaution' jury instruction in accordance with <u>Kotteakos</u>." (Pet. 53.) Putting aside that it is not the government's burden to request jury instructions that a defendant might find desirable, and further putting aside the fact that neither Roman nor any defendant requested such an instruction at trial or raised its absence as a ground of appeal, the argument rests on a misconstruction of a passage in <u>Kotteakos</u>. The Supreme Court in that case did not create an "extraordinary precaution" jury instruction of unspecified content that must be given in complex conspiracy trials. Rather, in the very different circumstances of the sprawling trial in that case, the Supreme Court noted that "extraordinary precaution is required, not only that instructions shall not mislead, but that they shall scrupulously safeguard each defendant individually, as far as possible, from loss of identity in the mass." <u>Kotteakos</u>, 328 U.S. at 776.

Although there was no "mass" in this case, in which the jury had six weeks to learn to differentiate the evidence against the mere three defendants who were on trial, the Court did indeed take such precautions, instructing the jurors that guilt was individual and that the evidence against each defendant had to be considered separately, forbidding them to find guilt by virtue of

12

a defendant's association or relationship to others, instructing them that a defendant could not be convicted on a conspiracy charge unless the single conspiracy charged in the indictment was proven beyond a reasonable doubt, emphasizing that a defendant could not be convicted based on proof that he or she was a member of a different conspiracy than the one charged in the indictment, and informing them that the government was required to prove beyond a reasonable doubt as to each individual defendant that he or she intentionally joined the charged conspiracy. Moreover, during the course of the trial the Court gave such limiting instructions as were appropriate with respect to any evidence received only as to fewer than all the defendants, and reinforced those instructions at the trial's conclusion by reminding the jury that it was to consider evidence admitted pursuant to such a limiting instruction only for the purposes indicated. Roman finds no fault with any of these instructions, and gives no indication of what additional "precaution" he believes the Court should have applied.

In short, Roman's claims that he was unfairly tried "en masse" with other defendants are completely without merit.

## IV. Remaining Claims

(1) Roman argues that based on unexplained emanations from the Confrontation Clause of the Sixth Amendment, he should have been permitted a separate trial and/or been permitted to call his co-defendants as witnesses at trial. (Pet. 55-56.) Once again ignoring all questions of procedural default, Roman's argument has no merit. He gives no indication of what exculpatory testimony he could have hoped to elicit from his co-defendants, or any reason to believe that either of them would have been more likely to waive his or her Fifth Amendment right against self incrimination to testify at a separate trial of Roman than at the joint trial at which all

13

defendants elected to stand on that right.  <u>See</u> <u>United States v. Finkelstein</u>, 526 F.2d 517, 523-24

(2d Cir. 1975) (setting forth requirements for a severance to secure a co-defendant's testimony).

      (2) Roman contends that his 25-year mandatory consecutive sentence for violating 18

U.S.C. § 924(c) violated the rule announced by the Second Circuit in <u>United States v. Williams</u>,

558 F.3d 166 (2d Cir. 2009) and <u>United States v. Whitley</u>, 529 F.3d 150 (2d Cir. 2008).  (Pet.

56.)  The Supreme Court has agreed to decide whether these cases were correctly decided.

<u>Abbott v. United States</u>, 130 S. Ct. 1284 (2010) (granting certiorari); <u>Gould v. United States</u>, 130

S. Ct. 1283 (2010) (same).  Contrary to the government's suggestion (Rody Letter at 12-13),

there is no need to wait for resolution of the cases now pending before the Supreme Court.  Even

assuming arguendo that <u>Williams</u> and <u>Whitley</u> will remain good law, Roman's sentences need

not be disturbed.  Because Roman did not raise the <u>Williams</u>/<u>Whitley</u> issue at sentencing, any

review, even on direct appeal – still more on collateral review, where a stricter standard of

procedural default would apply – would be for plain error.  And as the Second Circuit held in

<u>United States v. Payne</u>, 591 F.3d 46, 68 (2d Cir. 2010):

> [W]ere we to find error [in the imposition of a mandatory
> consecutive prison term pursuant to § 924(c)(1)(A)], we would be
> bound to conclude that the plain-error test is not met: Given that
> the firearms sentence is not to begin until Payne has completed his
> life, the 10-year sentence does not affect his substantial rights.

Exactly the same logic applies here: the correctness of imposition of a sentence consecutive to an

independent sentence of life in prison without the possibility of parole, even if erroneous, is a

purely academic question that cannot lead to a finding of plain error affecting substantial rights.

      (3) Roman demands that the Court dismiss any counts on which judgment was entered in

violation of the rule of <u>Rutledge v. United States</u>, 517 U.S. 292 (1996).  (Pet. 57.)  <u>Rutledge</u> held

that a defendant may not be punished separately for narcotics conspiracy in violation of 21

U.S.C. § 846 and operating a continuing criminal narcotics enterprise in violation of 21 U.S.C.

§ 848, as the former is a lesser-included offense within the other. 517 U.S. at 307. This rule

applies to Counts Nine and Ten of the indictment. But the Court followed the Rutledge rule by

declining to impose sentence on Count Nine, the lesser-included conspiracy count. As the rule

does not affect any other charges in the indictment, there was no Rutledge violation and Roman's

argument is without merit.

(4) Finally, Roman asks that he be re-sentenced on Count 11, "[i]n [a]ccordance with

Johnson v. United States, 313 F.3d 815 (2d Cir. 2002), without further elaboration of the nature

of the claim. (Pet. 57.) Johnson has no conceivable application to this case. In Johnson, the

Second Circuit held that defense counsel had provided ineffective assistance of counsel by failing

to challenge an erroneous calculation of the defendant's guideline offense level on a narcotics

charge. Roman does not suggest any error in the calculation of this offense level on Count 11,

and the Court detects none.

## CONCLUSION

Accordingly, for the reasons set forth above, Roman has shown no defect warranting

vacation of any aspect of his conviction and sentence. His petition pursuant to 28 U.S.C. § 2255

is therefore denied. As petitioner has not made a substantial showing of the denial of a

constitutional right, a certificate of appealability will not issue. See 28 U.S.C. § 2253(c)(2);

Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111–13 (2d Cir. 2000). To the extent

Roman seeks further relief in the Court of Appeals, he may do so in forma pauperis.

15

SO ORDERED.

Dated: New York, New York
       September 29, 2010

                                                    _____
                                                    GERARD E. LYNCH
                                                    United States Circuit Judge


                                        The Clerk of Court is directed
                                        to close this case. Any pending
                                        motions are moot.

16